1
2                    **UNITED STATES DISTRICT COURT**
3                        **DISTRICT OF NEVADA**
4
5    TIMOTHY WEBB                    )
                                     )        3:06-CV-0473-ECR (VPC)
6              Plaintiff,            )
                                     )
7        vs.                         )        **REPORT AND RECOMMENDATION**
                                     )        **OF U.S. MAGISTRATE JUDGE**
8    WHORTON, ET AL.                 )
                                     )
9              Defendants.           )        May 30, 2007
     _____ )
10
11          This Report and Recommendation is made to the Honorable Edward C. Reed, Jr., United
12   States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to
13   28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion to dismiss (#20).
14   Plaintiff opposed (#24) and defendants replied (#25).  The court has thoroughly reviewed the
15   record and the motions and recommends that defendants' motion to dismiss (#20) be granted in
16   part and denied in part.
17
18                    **I. HISTORY & PROCEDURAL BACKGROUND**
19          Plaintiff Timothy Webb ("plaintiff"), a *pro se* prisoner, is currently incarcerated at High
20   Desert State Prison ("HDSP") in the custody of the Nevada Department of Corrections ("NDOC")
21   (#1).  Plaintiff brings his complaint pursuant to 42 U.S.C. § 2000cc et seq., the Religious Land
22   Use and Institutionalized Persons Act ("RLUIPA"), and 42 U.S.C. § 1983, alleging violations of
23   his First and Fourteenth Amendment rights to free exercise of religion, due process and equal
24   protection of the law. *Id*.  Plaintiff names as defendants Glen Whorton, NDOC Director; Dorothy
25   Nash Holmes, NDOC Program Administrator; Reverend Jane Foraker-Thompson, NDOC
26   Supervising Chaplain; Dwight Neven, HDSP Warden; Isidro Bacca, HDSP Associate Warden;
27   Claude Willis, HDSP Associate Warden; Fr. Dave Casaleggio, HDSP Chaplain/Religious
28

1    Coordinator; and John Does #s 1 and 2.  *Id*., pp. 2-3.

2        Plaintiff practices the Wiccan religion, and has participated in Wicca rituals, ceremonies

3    and festivals for a number of years.  *Id*., p. 4.  In count I, plaintiff alleges that since November

4
     2004, when defendants promulgated and began enforcement Administrative Regulation ("AR")
5
     810, defendants have placed, and continue to place, substantial burdens on plaintiff's exercise of
6
7    the Wiccan religion.  *Id*., pp. 4-4B.  Plaintiff contends that in violation of his rights under

8    RLUIPA, the substantial burdens resulting from AR 810's application do not further compelling

9    governmental interests, nor is AR 810 narrowly tailored to the least restrictive means available.

10   *Id*.

11
         In count I, plaintiff alleges defendants violated RLUIPA by failing to supply food, oils,
12
13   herbs, and other items for worship, and that certain Wiccan traditions are limited to group

14   worship services and are prohibited for individual worshipers, including those in solitary

15   confinement.  *Id*.  Plaintiff claims that AR 810 denies use of fire and other items during ritual and

16
     also makes no provision for unpaid work prescription days.[1]  *Id*.
17
         In count II, plaintiff alleges defendants violated his First Amendment right to the free
18
19   exercise of religion and Fourteenth Amendment rights to due process and equal protection of the

20   law by drafting and implementing AR 810 without consulting a Wiccan expert and by allowing

21   other mainstream religions privileges not allowed to Wiccans.  *Id*.  Plaintiff also alleges that

22   Native Americans are allowed a special status to which Wiccans are not entitled.  *Id*.

23
         AR 810, entitled "Religious and Faith Group Activities and Programs," establishes NDOC
24

25
     ───────────────
26
     [1] Plaintiff also alleges in count I that AR 810 breaches a prior settlement involving the same issues,
27   to which the former NDOC Director was a party.  However, plaintiff was not a party to that case.  *See* 3:98-
     cv-390 HDM (RAM).  Therefore, even if the court had jurisdiction over a breach of a settlement agreement,
28   which generally, it does not, *see Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994),
     plaintiff does not have standing to assert a breach of this settlement.

policy and procedures for inmates to practice their religions and spiritual beliefs through faith groups (#20, Exhibit A).  AR 810 permits "reasonable access" to activities that allow individual or group worship, regular attendance at religious services, special ceremonies, holidays or holy days, and individual or group pastoral counseling.  AR 810.01, section 1.2.  It also provides that inmates will have reasonable access to:

> [a]ny special practice, custom, or activity, approved by the Director through the Supervising Chaplain, that is proved, by an outside sponsor or non-prison resource associated with that Faith Group, to be a mandatory tenet or activity required as part of the practice of that religion or faith.

*Id.*

Inmates are allowed to express their religious beliefs through fasting or eating a special religious diet, by observing holy days or holidays, through grooming habits, by wearing medals or medals or medallions, or by using "allowable" natural items for worship.  *Id.*, section 1.3. However, oils are prohibited, except baby oil sold in the canteen, and candles, incense, or herbs are prohibited in individual cells, but are permitted during group worship if approved and maintained in the communal group box and governed by only one member of the group.  *Id.*, section 1.3.5. Inmate faith group representatives are not allowed to visit an inmate in segregation, except that Native Americans, at the warden's discretion, are permitted to conduct a pipe ceremony for a segregated inmate (who is not in a maximum security or close-custody unit) once a month or for special occasions required by the Native American traditions.  *Id.*, section 1.6.3. Inmates are permitted to receive religious literature pursuant to NDOC's regulations regarding books and periodicals.  *Id.*, section 1.8.  Inmates may purchase approved religious items through the canteen or an approved vendor.  AR 810.03, section 1.1.  All religious items in a group box or inmate cell are subject to search at any time, although prison staff are instructed to conduct the

3

search in a manner sensitive to the inmate's religion and if possible, a chaplain should be present. *Id.*, 1.5.  Religious items, herbs and other natural items, other than those specifically listed in the Faith Group Overview, are prohibited.  AR 810.05, sections 1.6-1.7.

The Faith Group Overview lists each faith group and sets out the group's dietary considerations, fast days, holy days, worship practices broken down by individual and group, allowable personal items, and allowable group items (#20, Exhibit B).  The entry for the Wiccan faith provides that there are no special dietary standards; they have a number of holy days and full moons, but no unpaid work prescription days; their Sabbat is Saturday; personal worship is accommodated around work times; and outdoor or indoor group worship is permitted.  *Id.*, p. 8. Allowable personal items are numerous; however, items relevant to this case that are allowed for groups only are herbs and herbal teas; one wand no longer than eight inches that is not made of metal, glass or ceramic; and candles, herbs and incense, which are only permitted for on-site special ceremonies and only under supervision.  *Id*.

The Court notes that the plaintiff is proceeding *pro se*.  "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

### A.  Discussion

#### 1.  Motion to Dismiss Standard

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, all material allegations in the complaint are accepted as true and are construed in the light most favorable to the non-moving party.  *Barnett v. Centoni*, 31 F. 3d 813, 816 (9th Cir.

1994); *Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir. 1980).  "As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688-689 (9th Cir. 2001) (*quoting Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)).  However, Rule 12 provides

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b)(6).  Notwithstanding this rule, "a motion to dismiss is not automatically converted into a motion for summary judgment whenever matters outside the pleadings happen to be filed with the court."  *North Star Intern. v. Arizona Corp. Com'n*, 720 F.2d 578, 582 (9th Cir. 1983).  A motion filed with extraneous materials is to be treated as a motion for summary judgment only if the court relies on the material.  *Swedberg v. Marotzke*, 339 F.3d 1139, 1143-44 (9th Cir. 2003).  Conversion to summary judgment is at the discretion of the court and the court must take some affirmative action before conversion is effected.  *Id*. at 1144.

### 2. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist.  *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(C).  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi*

*v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, __ U.S. __, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

**B.   Analysis**

Defendants submit exhibits A and B, as well as the declaration of defendant Nash-Holmes, which outlines the steps taken to promulgate AR 810 and the rationale for the regulation for the regulation; therefore, the court converts defendants' motion to dismiss into a motion for summary judgment Rule 12(b)(6).[2]

---

[2] Plaintiff had notice that defendants' motion to dismiss might be treated as a motion for summary judgment, as he received a *Klingele* notice on November 21, 2006 (#21).

6

### 1. Count I – RLUIPA

Defendants contend that they are entitled to summery judgment because AR 810 is reasonable and does not burden plaintiff's religious exercise; however, even if the court were to find a burden here, it is "far from substantial" (#20, pp. 10-11). Even if the court determines that AR 810 places a substantial burden on plaintiff's religious exercise, defendants argue there is a compelling governmental interest in regulating religious activities and the regulation is the least restrictive means of furthering that interest. *Id*. Defendants conducted three years of research, reviewed many publications, and consulted with numerous religious experts before they promulgated AR 810. *Id*. Defendants made decisions to deny inmates certain items and limit rituals used in religious ceremonies based on safety, security and budgetary concerns. *Id*. Many of the items, though not available to individual inmates, are available to group leaders for use in group worship. *Id*. Although Native Americans are allowed to use fire during ceremonies and can possess religious items which are denied to members of other religions, "Native Americans have the unique status of being parties to treaties," are considered citizens of sovereign nations, and federal law has defined their religious practices, which defendants must accommodate. *Id*. Finally, certain items and practices denied to Wiccans under AR 810 are not "an essential and central practice of the Wicca faith," and therefore, prohibitions of such items and practices are not a burden to members of the Wiccan faith. *Id*.

Plaintiff responds that defendants' inquiry into whether certain Wiccan practices are "central" to the Wiccan religion is improper under RLUIPA, and that this argument alone constitutes a clear violation of the statute (#24, p. 10). Plaintiff further asserts that defendants have improperly treated the Native American inmates differently even though RLUIPA "confers no special status on an particular religious sect, and singles out no bona fide faith for

disadvantaged treatment." *Id*., p. 11.

Defendants' position is that RLUIPA does not grant inmates an unfettered right to religious accommodation, since it mandates deference to prison officials and requires a consideration of order, security and discipline (#25, p. 4). Defendants contend that all the restrictions placed on religious items are based on security concerns, such as creating potential fire hazard or enabling inmates to hide contraband among other personal property. *Id*., p. 5.

### (a) Law

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc *et seq*., provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

To establish a RLUIPA violation, the plaintiff bears the initial burden to prove that the defendants' conduct places a "substantial burden" on his "religious exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005); *see also Navajo Nation v. United States Forest Service*, __ F.3d __, 2007 WL 737900, *6 (9th Cir., Mar. 12, 2007). Once the plaintiff establishes a substantial burden, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Warsoldier*, 418

F.3d at 995.  RLUIPA is to be construed broadly in favor of the inmate.  *See* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution").  The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) whether there is a "burden," if any, imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest.  *Navajo Nation*, __ F.3d __, 2007 WL 737900 at *6.

Although RLUIPA does not define "substantial burden," the Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent.  That is, a 'substantial burden, on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."  *Warsoldier*, 418 F.3d at 995 (*quoting San Jose Christian coll. V. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  The burden need not concern a religious practice that is compelled by, or central to, a system of religious belief, *see* 2000cc-5(7)(A); however, the burden must be more than an inconvenience.  *Navajo Nation*, __ F.3d __, 2007 WL 737900 at *15 (internal quotations and citations omitted).  In fact, RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion."  *Cutter v. Wilkenson*, 544 US 706, 725, n. 13 (2005).  The burden must prevent the plaintiff "from  engaging in [religious] conduct or having a religious experience."  *Navajo Nation*, __ F.3d __, 2007 WL 737900 at *15 (internal citations omitted).

Courts must also take into account the burdens a requested accommodation may impose on non-beneficiaries.  *Cutter*, 544 U.S. at 720.  In its analysis of the "compelling governmental interest" standard, the court must exhibit a "particular sensitivity to security concerns" and be

9

"mindful of the urgency of discipline, order, safety, and security in penal institutions." *Id*. at 722-23.  To that end, the court should apply RLUIPA's standard with deference to the expertise of prison administrators in establishing regulations that will maintain order consistent with the consideration of costs and limited resources.  *Id*. (internal citations omitted).  Finally, the Supreme Court has specifically noted that RLUIPA "does not differentiate among bona fide faiths" and has stated that courts must be satisfied that RLUIPA's "prescriptions are and will be administered neutrally among different faiths."  *Id*. at 720, 723.

**(b) Analysis**

The first inquiry is whether the activity plaintiff wants to engage in constitutes "religious exercise."  Under RLUIPA, it is clear that defendants may not inquire whether a religious item or practice is "central" to the religion.  *See* 42 U.S.C. § 2000cc-5(7)(A).  Thus, all Wiccan religious items or practices are protected under RLUIPA.  Defendants do not dispute that the prohibited items and practices at issue here constitute "religious exercise."

Whether the deprivations in AR 810 constitute a "burden" which is "substantial" are the second and third inquiries.  Defendants' view is that the deprivation of religious items and practices is not a substantial burden to plaintiff because the items and practices are not "central" to the Wiccan religion.  The Ninth Circuit recently acknowledged that based on RLUIPA's expanded definition of "religious exercise," prior cases holding that a plaintiff had to establish that the state placed a burden on an item or practice "mandated" by his faith or a practice "central" to his faith, are no longer good law.  *Navajo Nation v. United States Forest Service*, __ F.3d __, 2007 WL 737900, *5 (9th Cir., Mar. 12, 2007).  As such, a court may find a burden where defendants have prohibited items and practices that are part of the Wiccan faith, even though they are not mandated by or central to the Wiccan faith.  The court rejects defendants'

argument that there is no burden because the items and practices at issue are not "central" to the practice of the Wiccan religion.

Defendants identify no other reason that AR 810's deprivations are not a burden, other than the general argument that NDOC has not entirely banned worship, only some practices, and therefore, plaintiff can still worship.  Defendants submit only the declaration of defendant Nash Holmes, NDOC Deputy Director of the Correctional Programs Division.  Her declaration states that NDOC conducted research after consultation with a Wiccan goddess and review of books, and it concluded that Wiccans are not required to engage in certain practices or use certain property (#20, Decl. of Nash Holmes).  There are no special dietary considerations other than "some form of biscuit or cake or cookie," and the food plaintiff requested was not deemed essential to his practice.  *Id*.  Nor was growing edible plants essential.  *Id*.  All of this may very well be true; however, there are two issues with defendants' arguments.  First, some of the statements in the declaration are hearsay.  Second, defendants present no evidence to the court, such as an affidavit or testimony from a Wiccan expert, as to what constitutes Wiccan religious practice.  It is not for this secular court to determine such issues.  Viewing the issue in the light most favorable to the plaintiff, since plaintiff's verified complaint alleges that these practices and items are part of the "religious exercise" of the Wicca religion, there is an issue of fact as to whether the deprivations of the items and practices in AR 810 constitute a substantial burden to plaintiff's practice of the Wiccan religion.

The court's analysis does not end there.  Even if there is a substantial burden on the plaintiff's practice of religion, if that burden is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest, plaintiff's rights under RLUIPA have not been violated.  This is the strict scrutiny test, which is the "most demanding

test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

It is clear that discipline, order, safety and security in prison are compelling governmental interests. *Warsoldier v. Woodford*, 418 F.3d 989, 998 (9th Cir. 2005). However, a generalized assertion of a compelling interest in security is not enough to justify a substantial burden on religious exercise under RLUIPA. *Gonzales v. O Centro Espirita Beneficente*, 126 S.Ct. 1211, 1220-21 (2006). Strict scrutiny requires inquiry on a case-by-case basis, looking at the facts and evidence in each case. *Id.*

Considering this action in the light most favorable to the plaintiff, the court concludes that there are genuine issues of material fact as to whether defendants have used the least restrictive means to achieve their compelling interest in prison security. Defendants provide only the Nash Holmes declaration to establish a compelling interest and that defendants have employed the least restrictive means to achieve those interests (#20). The declaration states that in order to accommodate the various faith group members within the prison, NDOC incurs financial costs to purchase, store and cook special dietary items, and also incurs manpower costs to supervise, secure and escort inmates to special ceremonies (#20, Decl. Of Nash Holmes, ¶7).

The declaration is unclear as to whether NDOC "actually considered and rejected the efficacy of less restrictive measures," *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005), other than limiting property items or prohibiting certain items and practices entirely. Defendants allow Native Americans to participate in certain activities, such as having open fires and cooking meals during religious ceremonies, while prohibiting other religions from engaging in those same activities under the guise of "safety and security." This suggests there is no particular safety and security concern justifying the policy, and that the fire prohibition for some inmates, but not others, is not the least restrictive means to insure prison safety and security. The government

interest in security is no less compelling when Native American inmates use fire as opposed to Wiccans. *Id*. at 1000.

As to the other issues plaintiff raises, such as the limits on property and the prohibition of spiritual oils and incense, the defendants state compelling reasons for such prohibitions. For example, oils, incense and herbs are used to mask drug use, inmates hide contraband and conduct illicit activities under plant cover, and contraband can be hidden amongst too much personal property. Nonetheless, defendants fail to identify whether other alternatives besides outright prohibition were considered and rejected. Strict scrutiny requires defendants to demonstrate that they followed certain steps. The issue the court has is that the Nash Holmes declaration generally states that the prison followed these steps, but defendants provide no such evidence.

Finally, and importantly, there is another issue of concern here. Defendants admit throughout their filings that Native Americans are treated differently from other religions (#20, pp. 5, 13-15; *see also* Decl. Of Nash Holmes, ¶¶14, 22). Plaintiff alleges that Native Americans are permitted the following privileges:

1. open fires, even though fires are prohibited throughout the NDOC system for all other religions;
2. outdoor cooking during their ceremonies;
3. food for such ceremonies;
4. personal possession of herbs, and
5. growing edible plants.

(#24; *see also generally* #24, Exhibit 5, AR 809). Defendants admit to some of these claims, but justify this preferential treatment by asserting that Native Americans have a "unique status," as they are subject to specific treaties, federal statutes, and case law in contrast to other religions (#20, Decl. Of Nash Holmes, ¶¶14, 22). The court is generally aware that there is jurisprudence pertinent to Native Americans; however, defendants fail to identify any treaties, statutes or cases

13

upon which they rely.  Defendants do not even state the general legal principles which allow them to give Native Americans preferential treatment over other religions.  RLUIPA prohibits any preferential treatment, and this court must be satisfied that RLUIPA's "prescriptions are and will be administered neutrally among different faiths." *Cutter v. Wilkenson*, 544 US 706, 720, 723 (2005).  The court is not satisfied.  If there are indeed treaties, statutes, and case authority which preempt the ban on differential treatment under RLUIPA, defendants are obliged to identify such laws to the court and make appropriate legal arguments.

The court acknowledges that defendants have a very difficult task in balancing inmate religious rights with safety, security and the limited resources of the prison system.  However, Congress has set a high bar with RLUIPA's strict scrutiny test.  As defendants have failed to demonstrate that there are no genuine issues of material fact, the court denies summary judgement on count I.

### 2. Count II

### (a) First Amendment Freedom of Religion

Defendants argue that AR 810 is reasonably related to legitimate penological interests of safety, security and cost because AR 810 does not impose a total ban on religion, but only upon certain religious activities that are deemed dangerous or costly to NDOC (#25, pp. 7-8).  Plaintiff contends that the mere existence of a separate regulation for Native Americans proves that there are no reasonable justifications for defendants' policies (#24, pp. 12-14).

### i. Law

"Convicted prisoners do not forfeit all constitutional protections" at the prison door.  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations

underlying our penal system." *Sandin v. Conner*, 515 U.S. 472, 485 (1995) (citations omitted). Prisoners' constitutional rights must be weighed with "due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Turner v. Safley*, 482 U.S. 78, 85 (1987). Limitations on rights arise both from the fact of incarceration and from the legitimate penological objectives of "deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).

In *O'Lone*, the court held that prison regulations alleged to infringe on religious rights are judged under the reasonableness standard set out in *Turner*. *Id*. at 349. *Turner* sets out a four-part test: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the rights that remain open to prison inmates"; (3) what "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and, (4) whether the "absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 89-90. The Court has stated that although "the availability of accommodations is relevant to the reasonableness inquiry, we have rejected the notion that 'prison officials... have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.'" *O'Lone*, 482 U.S. at 350, *quoting Turner*, 482 U.S. at 90-91.

### ii. Analysis

Turning now to the First Amendment analysis of AR 810, the court notes that unlike the strict scrutiny analysis under RLUIPA, the court here applies a rational basis test. The court finds that there is a valid, rational connection between AR 810 and legitimate penological interests. As to limits on religious property, such as candles, incense, herbs, spiritual oils, and certain other

15

Wiccan items, defendants have identified legitimate concerns of safety, security and costs to NDOC. Defendants offer several reasons to prohibit or limit certain property: inmate jealousies, bartering and theft of religious items creates unrest; the ability to mask drug use with incense, scented oils and herbs; the use of religious items such as Wiccan wands as weapons; the cost to the prison to inspect an inmate's cell which contains religious property, and the ability to hide contraband in excessive property (#20, pp. 11-12). With regard to the prohibition on growing edible plants, defendants contend that inmates use plants to hide contraband, weapons and drugs and hide certain activities under plant cover and out of the scrutiny of NDOC staff. *Id*., p. 18.

The second *Turner* factor is also met. Although plaintiff is not able to use all of the items he contends are part of the Wiccans traditions, he is able to practice within a group setting with many religious items that are prohibited on an individual level. Plaintiff admits he participates in rituals, ceremonies and festivals, *see* #9, p. 4, although it is not clear whether this is in an individual or group setting. Nowhere in his complaint does plaintiff assert that he never practices in a group or that group worship is against his interpretation of the Wiccan religion, nor does he allege that he solely practices as an individual. Plaintiff is clearly free to worship on his own, albeit without the religious items that are prohibited.

The third factor is also met. Defendants state that to allow plaintiff the prohibited items would increase NDOC's monetary and manpower costs. NDOC would require more officers if prisoners are allowed excessive personal property. Considering that there are 12,525 inmates within the NDOC system, the cost to NDOC to conduct cell searches for contraband, weapons and drugs is high (#20, Decl. of Nash Holmes, ¶ 8). This applies to searches of plant areas as well. Prison officials may also be subject to physical harm should some of the items available to inmates be turned into weapons. Additionally, more correctional officers must be allocated to

monitor religious activities, which affects oversight of other prisoner programs.

Finally, defendants meet the fourth *Turner* factor.   Prison officials promulgated a regulation that meets safety, security and cost issues while still allowing inmates to practice their religion, with some restrictions.   AR 810 strikes a reasonable balance between these concerns. Prison officials are given much deference in their decisions regarding the security of the institution, and what is required for the day-to-day running of the prison system. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (limitations on rights arise both from the fact of incarceration and from the legitimate penological objectives of "deterrence of crime, rehabilitation of prisoners, and institutional security").   Under *Turner*, prison officials are not required to consider and reject every alternative.   *Id*. at 350.

However, there is continuing tension with respect to the privileges permitted for Native American that are not permitted for other inmates.   As to open fires, cooking ceremonial meals, and any other religious practice common to both Native Americans and Wiccans which are granted to Native Americans but denied to Wiccans, the defendants have failed to demonstrate that they meet the *Turner* test or that there are no issues of fact as to whether the defendants' justifications are reasonable.   The court grants summary judgment on plaintiff's count II First Amendment claim except those based on religious practices and items common to Native American and Wiccan practices which are granted to Native Americans but denied to Wiccans.

**(b) Procedural Due Process**

Defendants claim that the passage of AR 810 was legislative in nature; therefore, no due process was required to be afforded to plaintiff (#20, p. 24, *citing Halverson v. Skagit County*, 42 F.3d 1257, 1260 (9th Cir. 1994)).   Plaintiff offers no opposition to defendants' argument (#24). ///

### i. Law

The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only when a constitutionally-protected liberty interest is at stake. *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1993), *citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Liberty interests can arise both under the Constitution and from state law. *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974). Courts may find a liberty interest in a prisoner's conditions of confinement based on state policies or regulations, although the Supreme Court has stated that such an interest

> [w]ill be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force... impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted).

### ii. Analysis

Plaintiff alleges a violation of his due process rights in count II (#9, p. 3). However, plaintiff fails to respond to defendants' argument that there was no violation of his due process rights, nor has plaintiff anywhere identified an applicable liberty interest that requires notice and an opportunity for a hearing concerning the promulgation of AR 810 (#24). Moreover, defendants' have submitted undisputed evidence that defendants permitted inmates practicing the Wiccan religion to submit comments during the promulgation of AR 810 (#20, Decl. Of Nash Holmes, ¶ 19).

Pursuant to Local Rule of Civil Practice 7-2, "The failure of an opposing party to file points and authorities in response to any motion shall constitute a consent to the granting of the motion." L.R. 7-2(d). As defendants' motion is unopposed and for the further reasons stated above, the court grants defendants' motion for summary judgment on the procedural due process

claim in count II.

### (c) Equal Protection

Defendants assert that plaintiff cannot demonstrate that defendants acted with purpose or intent to discriminate against plaintiff as a member of the Wicca faith, while favoring other faith groups (#20, p. 22).  Moreover, plaintiff must allege facts, as opposed to general conclusions, that defendants were personally involved in the deprivation of equal rights.  *Id*.  Since many people were involved in the promulgation of AR 810 over a period of three years, plaintiff cannot prove that any defendant had the intent to discriminate against the Wicca religion.  Defendants contend once again that the different treatment of Native Americans is based on "certain federal laws and treaties that do not apply to the Wicca inmates."  *Id*.

Plaintiff replies that practices that result in the unequal treatment of inmates are permissible only if they bear a rational relationship to a legitimate penological interest (#24, p. 14).  Plaintiff argues that there is no rational reason to allow Native Americans to fully practice their faith while preventing Wiccans from doing the same.  *Id*.

Defendants admit that the denial of a privilege to followers of one religion while granting it to another is discrimination on the basis of religion and is a violation of the equal protection clause, but argue that not all religious sects within a prison must have identical facilities or personnel (#25, p. 5).  Defendants argue that AR 810 is general in nature, applies to all religions, and that the plaintiff is merely unhappy about how the regulation affects his Wiccan practice.  *Id*.

### i. Law

To state a claim for violation of equal protection under the Fourteenth Amendment, a plaintiff must demonstrate that the defendants acted with an intent to discriminate against him based on a fundamental right or his membership within a protected class.  *Barren v. Harrington*,

152 F.3d 1193, 1194-95 (9th Cir. 1998).

### ii. Analysis

Defendants admit that Native American religious practices are treated differently than practices in other religions (#20, pp. 13-15, 22; *see also* Decl. of Nash Holmes, ¶ 14). In fact, there is a separate regulation dealing specifically with Native American religious practices (#24, Exhibit 5, AR 809). There are also provisions within AR 810 allowing Native Americans exceptions to the rules. *See* AR 810, section 1.6.3. All of this is evidence of intentional discrimination. *Regents of University of California v. Bakke*, 438 U.S. 265, 289, n. 27 (1978) (finding that where defendant's policy "involves purposeful, acknowledged use of racial criteria," the policy is not neutral on its face). Defendants again justify the differential treatment based on treaties, statutes and case law specific to Native Americans. Again, defendants's justification run afoul because they cite to no specific law. The court finds that defendants have not sufficiently shown that there is no genuine issue of material fact and denies summary judgment on plaintiff's equal protection claim in count II.

### 3. Qualified Immunity

Defendants contend that they are entitled to qualified immunity should the court find a constitutional violation, *see* #20, p. 6, 24-25, and plaintiff's position is that his rights are clearly established and that defendants were aware of his rights based on a prior settlement with members of the Wiccan faith (#24).

### (a) Law

The defense of qualified immunity protects state officials sued in their individual capacities unless the conduct complained of violates a clearly established constitutional or statutory right of which a reasonable person would have known. *Jackson v. City of Bremerton*,

268 F.3d 646, 650 (9th Cir. 2001).  A qualified immunity analysis begins with a threshold question of whether, based upon facts taken in the light most favorable to the party asserting the injury and in light of such clearly established law, an official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If no constitutional right was violated, the court need not inquire further.  *Id*.  However, if a constitutional violation occurred, the court's second inquiry is whether the official could nevertheless have reasonably, but mistakenly, believed that his or her conduct did not violate a clearly established constitutional right.  *Id*.

**(b) Analysis**

The court must begin by asking whether, based upon facts taken in the light most favorable to the plaintiff, defendants violated any of plaintiff's clearly established constitutional rights.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The rights at issue in this case – the right to free exercise of religion as well as the right to equal protection based on the fundamental right of freedom of religion – are both clearly established.

As the court concluded above, genuine issues of material fact exist as to whether: (1) defendants' regulations allowing privileges to Native Americans and not plaintiff as a Wiccan practitioner are reasonably related to the legitimate penological interest of security so as not to violate plaintiff's First Amendment right to the free exercise of religion; and (2) whether defendants violated the equal protection clause by allowing privileges to Native Americans and not plaintiff as a Wiccan practitioner. If there is a material dispute as to the facts regarding whether the actions of the defendants violated a constitutional right, the case must proceed to trial. *LaLonde v. County of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000), *citing Act-Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).  Such is the case here.  The court denies qualified immunity for defendants.

**4. Official Capacity Immunity**

Defendants additionally argue they cannot be sued in their official capacities for money damages (#20, pp. 20-21).  The court agrees.  Plaintiff has sued all defendants in both their individual and official capacities (#1, pp. 2-3).  The Supreme Court has held that a suit against a state official in his or her official capacity is not suit against that official, but rather a suit against the official's office; therefore, an official acting in his or her official capacity is not a "person" under section 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  However, when a state official is sued in his official capacity for prospective injunctive relief, he is considered a "person" for the purposes of section 1983.  *Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d 836, 839 (9th Cir. 1997). The court grants the defendants' motion to dismiss the plaintiff's claims against each defendant in their official capacity with respect to plaintiff's claims for money damages, if any.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes as follows:

1.  Defendants have not produced enough evidence to demonstrate that there is no genuine issue of material fact as to whether AR 810 is a substantial burden on plaintiff's religious practice, nor have they produced evidence to demonstrate that there is no genuine issue of material fact as to whether the prohibitions in AR 810 are the least restrictive means available to achieve security goals;

2.  Defendants produced undisputed evidence that the limits on religious items and prohibition on growth of edible plants pursuant to AR 810 are reasonably related to the legitimate penological purposes of safety, security and costs.  Defendants failed to produce enough evidence to demonstrate that their policy of granting Native

22

Americans certain rights that are denied to Wiccans, such as open fires and ceremonial cooking, is reasonably related to legitimate penological purposes;

3.   Plaintiff did not oppose defendants' motion for summary judgment as to his procedural due process claim and there is undisputed evidence to suggest that plaintiff had the opportunity to participate in the promulgation of AR 810;

4.   Defendants did not produce enough evidence to demonstrate that they did not violate plaintiff's equal protection rights by granting Native Americans privileges they admittedly denied plaintiff;

5.   Defendants are not entitled to qualified immunity because there are issues of material fact as to whether defendants violated plaintiff's constitutional rights; and

6.   Defendants cannot be sued in their official capacity for money damages.

As such, the court recommends that defendants' motion to dismiss (#20) be:

**GRANTED** as to (1) plaintiff's count II First Amendment claim for limits on religious items and prohibition on growth of edible plants; (2) plaintiff's count II procedural due process claim; and (3) all claims against defendants in their official capacities for money damages; and

**DENIED** as to (1) plaintiff's RLUIPA claim; (2) plaintiff's count II First Amendment claim as to defendants' policy of granting Native Americans certain rights that are denied to Wiccans; and (3) plaintiff's count II equal protection claim.

The parties are advised:

1.   Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the

23

District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion to dismiss (#20) be:

**GRANTED** as to (1) plaintiff's count II First Amendment claim for limits on religious items and prohibition on growth of edible plants; (2) plaintiff's count II procedural due process claim; and (3) all claims against defendants in their official capacities for money damages; and

**DENIED** as to (1) plaintiff's RLUIPA claim; (2) plaintiff's count II First Amendment claim as to defendants' policy of granting Native Americans certain rights that are denied to Wiccans; and (3) plaintiff's count II equal protection claim.

**DATED:** May 30, 2007.

_Valerie P. Cooke_
_____
**UNITED STATES MAGISTRATE JUDGE**